UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

JAMES CARAWAY,                          )
                                        )
        Plaintiff,                      )
                                        )   No. 1:10-cv-247
v.                                      )
                                        )   Chief Judge Curtis L. Collier
GOODMAN MANUFACTURING                   )
COMPANY, L.P.,                          )
                                        )
        Defendant.                      )

**M E M O R A N D U M**

Before the Court is Defendant Goodman Manufacturing Company, L.P.'s ("Goodman") motion for summary judgment (Court File No. 12). Plaintiff James Caraway ("Plaintiff") responded (Court File No. 15), and Goodman replied (Court File No. 16). For the following reasons, the Court will **DENY** Goodman's motion (Court File No. 12).

**I.    FACTS**[1]

This is a diversity action for retaliatory discharge, brought solely under Tennessee law. Goodman is a manufacturer of furnaces and air conditioning units. Plaintiff was employed as an "Auto Braze Operator" at Goodman's facility in Dayton, Tennessee for approximately 40 days during the summer of 2010. He was terminated either on July 23 or August 2, a distinction fraught with significance, as explained below.

Conditions in Goodman's facility were quite hot during the summer. On July 20, 2010,

---

[1] Most facts in this case are either uncontested or uncontested for purposes of the motion, with one notable exception. The present exposition of the facts draws primarily from the account provided in Goodman's brief, an account Plaintiff apparently found satisfactory inasmuch as Plaintiff included no facts section in his own brief.

Plaintiff began suffering from heat exhaustion. Attempting to cool down, he found his way to the restroom and there passed out. He was quickly found and given assistance. Thomas Hanna, the second shift supervisor for the facility, used ice packs, water, and a wet rag to cool Plaintiff. Later, Hanna filled out an incident report, indicating Plaintiff "was feeling nausatiated [sic] and was complaining of serve [sic] cramps" (Court File No. 12-3, p. 15). Hanna advised Plaintiff to call his wife to pick him up, which Plaintiff did. Before Plaintiff left with his wife, Hanna told him if he still did not feel good in the morning, he should call the plant and let them know he was going to the hospital to be examined.

The next day, July 21, 2010, Plaintiff came to the plant and told Environmental Health and Safety Coordinator Paul Smith he was still feeling ill, and was going to go to the emergency room. At first, Smith advised Plaintiff to go to Plaintiff's own doctor and pay for the visit himself, but Plaintiff insisted Goodman should pay for his coverage since the incident happened at work. Smith eventually agreed, and made an appointment for Plaintiff to visit Dr. Sithipol Tantihachai at the company's expense. Plaintiff then went to Dr. Tantihachai, who diagnosed him with heat exhaustion. Dr. Tantihachai referred Plaintiff to the hospital for blood work, and released Plaintiff to work that day so long as he worked in a cool environment. Plaintiff returned to the plant after having his blood work done, and spent the rest of the work day doing light office work in the front office.

On July 22, 2010, Plaintiff had a follow-up appointment with Dr. Tantihachai. Dr. Tantihachai recommended Plaintiff admit himself to the hospital, which Plaintiff did. Later that day, Terry Owens, Goodman's Eastern Claims Manager for Worker's Compensation, wrote an e-mail to several company employees, including Smith, stating Plaintiff's condition was "very urgent," that

Dr. Tantihachai was concerned about organ failure, and that there was no question Plaintiff's injury was work-related. A few hours later, Owens wrote a follow-up e-mail stating Plaintiff "was admitted this afternoon with heat exhaustion, dehydration, renal insufficiency and abnormal labs. His potassium levels continue to drop, the urine is very concentrated and his white blood cell count continues to climb" (*id*. at p. 18). Plaintiff stayed in the hospital overnight, receiving intravenous fluids. On July 23, 2010, he was discharged from the hospital and released to work.

That same day, Plaintiff traveled to the plant to speak with Smith and to give him the release note from the doctors. What Smith said to Plaintiff during that conversation is the chief factual dispute in this case. According to Plaintiff, Smith "sa[id], I'm really disappointed. He said this has caused a lot of trouble over this and right now I don't – you know, got – there's been a lot of situation over this and I don't think you need to worry about coming back. And he turned around and walked off out of the lobby. Said that I had ruined their perfect record of no workman comps and walked off" (Court File No. 12-2, p. 11). Plaintiff interpreted this exchange as indicating Smith was terminating him. Plaintiff went home, and the next day tried to call Goodman human resources but was "put on hold and left on hold" (*id*.). At that point, Plaintiff "figured that due to the situation and the lecture that I got from Paul Smith when I delivered the doctor's note, that it was safe for me not to go back on the plant property" (*id*.).

Goodman disputes Plaintiff's account of the conversation between Plaintiff and Smith. However, even accepting Plaintiff's account as true for purposes of the motion, Goodman avers Plaintiff was not, *in fact*, terminated on July 23, 2010, regardless of what Plaintiff may have subjectively believed. A July 23, 2010 e-mail from Smith to several Goodman employees corroborates that Plaintiff and Smith spoke, but makes no mention of Smith terminating Plaintiff:

3

> James Caraway has been cleared by the doctor to return to regular today (7/23/10). He missed one day for Workers' Compensation. When he handed me the paperwork he stated that he would not be in this afternoon due to personal health reasons.

(Court File No. 12-3, p. 21). On July 26, 2010, Owens wrote to Smith inquiring whether Plaintiff was terminated. Smith responded "I checked with Nickie [Tidwell], and as far as we know he is still employed" (*id*. at p. 23). Owens wrote back to Smith and Tidwell, stating "Hmmm . . . he has been calling the nurse case manager indicating he was terminated! She was trying to get more information for me . . ." (*id*.). At this point, Tidwell replied "I am the one that does the paperwork terming employees and I have not completed anything on him" (*id*.).

The next day, July 27, 2010, Dayton Human Resources Manager Scott Johnson called Plaintiff's wife. Plaintiff was present when his wife received the phone call, and "overheard every bit of [the conversation]" because his wife turned on speaker phone (*id*. at p. 15). Plaintiff heard Johnson tell his wife that "there was a big misunderstanding" and Plaintiff had not been fired and could go back to work (*id*.). However, Plaintiff did not interject into the conversation or call Johnson back, apparently on advice of counsel, which he had just obtained that morning. In the following days Plaintiff did not return to work. On August 2, 2010, Johnson wrote Plaintiff the following termination notice:

> James,
>
> I am writing this letter to inform you that your employment with Goodman Manufacturing has been terminated. We have reached this decision after more than one week has lapsed and you have not come to work or contacted us. Several attempts have been made to contact you and you have not returned my calls as to the reasons for your absences.
>
> No call/no show is a violation of company policy and is grounds for dismissal.

(Court File No. 12-3, p. 28). Plaintiff received the termination notice on August 9, 2010. On

4

August 31, 2010, Plaintiff filed suit against Goodman, alleging retaliatory discharge in violation of Tennessee law.

II.  **STANDARD OF REVIEW**

Summary judgment is proper if the movant shows, based on the materials in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). First, the moving party must demonstrate no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The Court views the evidence, including all reasonable inferences, in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). However, the non-movant is not entitled to a trial based solely on its allegations, but must submit significant probative evidence to support its claims. *Celotex*, 477 U.S. at 324; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Should the non-movant fail to provide evidence to support an essential element of its case, the movant can meet its burden of demonstrating no genuine issue of material fact exists by pointing out such failure to the court. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

The moving party is entitled to summary judgment if the non-movant fails to make a sufficient showing on an essential element for which it bears the burden of proof. *Celotex*, 477 U.S. at 323. In short, if the Court concludes a fair-minded jury could not return a verdict in favor of the non-movant based on the record, the Court may enter summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir.

1994).

**III.   ANALYSIS**

Plaintiff brings his retaliatory discharge claim against Goodman pursuant to the Tennessee Workers' Compensation Law ("TWCL"), Tenn. Code Ann. §§ 50-6-101 *et seq.*, alleging Goodman terminated him on July 23, 2010 because he had asserted a workers' compensation claim. *See Clanton v. Cain-Sloan Co.*, 677 S.W.2d 441, 445 (Tenn. 1984) (holding that "a cause of action for retaliatory discharge, although not explicitly created by the [TWCL], is necessary . . . to carry out the intention of the legislature"). To make out a *prima facie* case of workers' compensation-related retaliatory discharge, a plaintiff must show: "(1) The plaintiff was an employee of the defendant at the time of the injury; (2) the plaintiff made a claim against the defendant for workers' compensation benefits; (3) the defendant terminated the plaintiff's employment; and (4) the claim for workers' compensation benefits was a substantial factor in the employer's motivation to terminate the employee's employment." *Anderson v. Standard Register Co.*, 857 S.W.2d 555, 558 (Tenn. 1993). Once a plaintiff makes out a *prima facie* case of retaliation, the employer then bears "the burden of showing a legitimate, non-pretextual reason for the employee's discharge." *Id*. at 559. If the employer meets this burden, "the burden shifts back to the employee to prove the employer's explanation is pretextual." *Frizzell v. Mohawk Indus.*, No. M2004-01598-COA-R3-CV, 2006 WL 1328773, *3 (Tenn. Ct. App. May 15, 2006).

Here, both parties agree there is no dispute as to the first three elements. Curiously enough, the Court disagrees. With respect to the third element, while it is undisputed Plaintiff was terminated *at some point*, the actual date of his termination is an intractable factual dispute which

6

blocks summary disposition of this case. The parties mean very different things when the speak of the fact "the defendant terminated the plaintiff's employment." According to Plaintiff, he was orally terminated by Smith on July 23, 2010. According to Goodman, Plaintiff was terminated on August 2, 2010, after a week of failing to report to work. This is not an immaterial difference. Implicit within the different referents of the phrase "Plaintiff's termination" is the entire controversy over whether Plaintiff's workers' compensation claim was a "substantial factor" in Goodman's decision to terminate him. Put simply, oral termination by Smith on July 23, 2010 is highly probative of retaliatory motive; termination on August 2, 2010 after a week of no-shows suggests no retaliatory motive was at play.[2]

Plaintiff has certainly presented evidence which, viewed in the light most favorable to Plaintiff, supports finding he was terminated on July 23, 2010. According to Plaintiff, on July 23, 2010 Smith told Plaintiff he was disappointed in him, and "said this has caused a lot of trouble . . . there's been a lot of situation over this and I don't think you need to worry about coming back" (Court File No. 12-2, p. 11). Goodman attempts to avoid any implications of this exchange by highlighting the July 27, 2010 phone call from Johnson to Plaintiff's wife, in which Plaintiff admittedly heard Johnson say there had been a "big misunderstanding" and Plaintiff had not been fired. According to Goodman, this phone call, along with internal documents indicating Plaintiff was not officially terminated until August 2, 2010, conclusively establishes Plaintiff was not terminated on June 23, 2010. The Court disagrees. Viewing the evidence favorably to Plaintiff, and taking his account of his exchange with Smith as true, it is entirely possible Plaintiff was terminated

---

[2]Pegging Plaintiff's termination date here also would satisfy Goodman's subsequent burden of presenting a legitimate, non-discriminatory reason for Plaintiff's termination.

7

*in fact* by Smith on July 23, 2010, while being formally terminated by Johnson on August 2, 2010. This could be because Smith never told others, including Johnson and Tidwell, that he had terminated Plaintiff on July 23, 2010. Or it could be because Smith told others, who realized the termination may have been unlawful, and who therefore decided to contact Plaintiff and frame the whole thing as a "big misunderstanding." For purposes of summary judgment, the Court need not decide these or any other scenarios are true; it is enough that they are plausible and sufficient to explain how Plaintiff could have heard Johnson say on July 27, 2010 that he had not been terminated, yet it still be true that *in fact* Plaintiff had been terminated on July 23, 2010.

By submitting evidence tending to show he was orally terminated by Smith on July 23, 2010, Plaintiff has likewise made a sufficient showing for the fourth prong of his *prima facie* case: that his workers' compensation claim was a "substantial factor" in Goodman's decision to terminate him. *See Anderson*, 857 S.W.2d at 558. For the evidence tending to show Plaintiff was terminated on July 23, 2010 – namely, the alleged statement by Smith that Plaintiff's workers' compensation claim had caused "a lot of trouble" and therefore Plaintiff need not return to work – is also direct evidence of a retaliatory motive. Goodman has put forward no evidence suggestive of a legitimate, non-pretextual motive for terminating Plaintiff on July 23, 2010.[3] It is therefore unnecessary for the Court to consider whether Plaintiff can show any such reason to be pretextual.

Viewing the evidence in the light most favorable to Plaintiff, the Court finds there is a

---

[3]Goodman's proffered legitimate, non-pretextual reason for terminating Plaintiff is his "no call/no show" status from July 23 to August 2, 2010. However, this reason is only apposite if it is assumed Plaintiff was not terminated until August 2, 2010. As already explained, there is a legitimate, material factual dispute as to whether Plaintiff was terminated on July 23, 2010. If he was, Goodman's proffered legitimate, non-pretextual reason is actually unresponsive to Plaintiff's *prima facie* case of retaliation.

8

genuine question of material fact as to whether Goodman terminated Plaintiff on July 23, 2010 in retaliation for Plaintiff's exercise of workers' compensation rights. It is for the jury, not the Court, to decide whether it believes Plaintiff's account of his exchange with Smith on July 23, 2010, and what the relevance of that exchange is in light of other evidence supporting Goodman's contention Plaintiff was not terminated until August 2, 2010. Accordingly, Goodman is not entitled to summary judgment.

IV. **CONCLUSION**

For the reasons stated above, the Court will **DENY** Goodman's motion for summary judgment (Court File No. 12). The case will proceed to trial.

**An Order shall enter.**

/s/
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**

9

Case 1:10-cv-00247-CLC-WBC Document 21 Filed 12/05/11 Page 9 of 9 PageID #: 176